**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

DEBRA N.[1],

Plaintiff,

v.                                                      5:18-CV-215
                                                        (ATB)

COMMISSIONER OF SOCIAL SECURITY,

Defendant.

ELIZABETH KRUPAR, ESQ., Legal Aid Soc. of Mid-New York, for Plaintiff
LUCY WEILBRENNER, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## MEMORANDUM-DECISION and ORDER

This matter was referred to me, for all proceedings and entry of a final judgment,

pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in

accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y.

Local Rule 73.1, and the consent of the parties. (Dkt. Nos. 4, 5).

## I.    PROCEDURAL HISTORY

On January 26, 2015, plaintiff protectively filed an application for Disability

Insurance Benefits ("DIB"), alleging disability beginning December 5, 2014.

(Administrative Transcript ("T") 147-55).  Plaintiff's applications were denied initially

on April 7, 2015.[2] (T. 67-76).  Plaintiff requested a hearing, which was held by video

---

[1] In accordance with recent guidance from the Committee on Court Administration and Case Management of the Judicial Conference of the United States, which was adopted by the Northern District of New York in June 2018 in order to better protect personal and medical information of non-governmental parties, this Memorandum-Decision and Order will identify the plaintiff using only her first name and last initial.

[2] The ALJ's decision states that the initial denial of plaintiff's application was April 15, 2015. (T. 19).  However, the Disability Determination and Transmittal is dated April 7, 2015, and the "Notice

before Administrative Law Judge ("ALJ") Michael Carr on December 20, 2016. (T. 34-66). On March 8, 2017, ALJ Carr issued an order denying plaintiff's applications. (T. 19-29). The ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on December 29, 2017. (T. 1-5).

## II.    GENERALLY APPLICABLE LAW

### A.    Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner]

---

of Disapproved Claim" is alleged to be dated on April 8, 2015 (there is no date on the document, but the Transcript's Index states that the document is dated April 8, 2015. (T. 67-76, 79-83). These discrepancies are not relevant to the court's decision, but are simply noted in the interest of accuracy.

next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner ] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520,

416.920. The plaintiff has the burden of establishing disability at the first four steps.

However, if the plaintiff establishes that her impairment prevents her from performing

her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

## B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine

whether the correct legal standards were applied and whether substantial evidence

supported the decision. *Selian v. Astrue*, 708 F.3d at 417; *Brault v. Soc. Sec. Admin,*

*Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence

is "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012). It must be "more

than a scintilla" of evidence scattered throughout the administrative record. *Id.*

However, this standard is a very deferential standard of review " – even more so than

the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial

evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id*. *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III.  <u>FACTS</u>

Plaintiff was born on September 15, 1963 and was 53 years old at the time of the ALJ hearing. (T. 43). Plaintiff finished high school and attended college for three years.[3] (*Id.*) Plaintiff had vocational training to become a Licenced Practical Nurse ("LPN"), and she worked at jobs involving home health care for more than 20 years. (T. 44-45, 246). On December 7, 2014, plaintiff suffered a ruptured basilar artery aneurysm, for which she was hospitalized until January 9, 2015. (T. 275). Plaintiff testified that she had no recollection of the entire 34 day hospital stay. (T. 46).

---

[3] Plaintiff testified that she did not finish her junior year. (T. 43).

At the hearing plaintiff testified that she was "still finding [her] new norm," and that she was sleeping more than she did before, but that she was "definitely better than [she] was two years ago." (T. 47). Plaintiff testified that the long-term effects of her aneurysm included "nonstop ringing in her ears; sensitivity to light and sound; and inability to sneeze, cough, bend forward, or squat down without worrying that she was going to have another stroke. (T. 47-48). Plaintiff testified that she could feel the pressure in her head. (T. 48). Plaintiff also testified that she got "emotional" and had an "emotional problem." (T. 47).

When she was asked if she experienced these symptoms on a daily basis, plaintiff responded that she avoided the movements or activities that caused the symptoms, but that she was conscious of the "pressure" every day. (T. 49). Plaintiff said that in order to compensate for the problems, she stopped doing various activities, such as picking up her grandchild or picking up "discernable weight." (T. 49). She also had a problem with "the spasticity of her neck," so she was careful when bending forward, and she was not supposed to "put her head in an inverted position." (*Id.*) Plaintiff also avoided night driving because of the lights. (T. 50). Plaintiff also avoided fluorescent lights because bright lights causes her ears to ring more. (T. 51). Plaintiff stated that she tried "to figure out what I can and cannot do[,] [a]nd every day I feel I've gotten better at what I can do." (T. 49-50).

Plaintiff testified that her ability to lift changed throughout the day, depending on how she felt. (T. 52). Plaintiff testified that if she sat or squatted to long, she became dizzy, but that she had a "better time" standing than she did sitting. (T. 52-53). She found walking to be helpful. (T. 53). Plaintiff also testified that she was seeking vocational training. (T. 50).

Plaintiff testified that the aneurysm changed her whole life, and that she was going to counseling to help her adapt to those changes. (T. 53). Plaintiff stated that she had "memory issues," and that she had a couple of episodes in the two years after the aneurysm during which she had "no recollection of certain periods of time." (T. 54). However, she practiced "mindfulness," so she was "usually pretty good." (*Id.*) Plaintiff also testified that she wrote in a journal, and she was not sure if her memory problem had gotten better or worse. (*Id.*)

Plaintiff testified that during a "normal day," she walked to her parents' home and did "stuff" for family.[4] (*Id.*) Plaintiff stated that she volunteered for different activities "through the town," and she volunteered at "the school," trying to determine what she could do. (*Id.*) Plaintiff testified that, it was exhausting if she tried to do too much, but she felt as if she had gotten better. (T. 55). She stated that "last year," she spent a couple of days per week volunteering at her grandson's kindergarten class, and she was able to "build on [her] tolerance." (*Id.*)

Plaintiff testified that she took Elavil in the evening for her depression, and that the medication helped the depression and the headaches. (T. 56). She stated that the Elavil "knocks [her] out." (*Id.*) With respect to the headaches, plaintiff stated that she had a "constant discomfort," all along the base of her brain, and that "sometimes [the discomfort] moves up." (T. 57). Plaintiff testified that during the hearing, she was having pain across the back of her neck. (*Id.*) Plaintiff stated that the doctors had not pinpointed the cause of the "spasticity" in her neck, but that light, sound, stress, and lifting could bring it on. (T. 58). Plaintiff had a driver's license, and her driving was

---

[4] Plaintiff's father had a stroke the same that plaintiff had her aneurysm. (T. 54).

limited[5] in "the beginning." (T. 57)  Plaintiff testified that, at the time of the hearing, she still only drove during the day. (*Id.*)  She stated that driving could sometimes bring on "the anxiety," but that she had a "big support system" if she needed a ride. (*Id.*)

The ALJ heard testimony from Vocational Expert ("VE") James J. Radke. (T. 59-66).  The ALJ asked VE Radke to consider a hypothetical individual of the plaintiff's age, education, and Past Relevant Work ("PRW"). (T. 60).  The ALJ then added the following restrictions: the individual would be limited to unskilled light work, with "posturals . . . occasionally." (*Id.*)  The individual could frequently reach with the right upper extremity, but was limited to performing simple, routine tasks, and making simple work-related decisions. (*Id.*)  The individual could not perform work involving conveyer belts or assembly lines, must avoid bright flashing lights, must have a work environment with no more than a moderate level of noise, and could not operate a motor vehicle for commercial purposes. (*Id.*)

The VE stated that the above restrictions would rule out plaintiff's PRW, but that there were other jobs that the hypothetical individual could perform. (T. 61).  The VE testified that there were receptionist jobs that the hypothetical individual could perform which were sedentary, unskilled, with an SVP[6] of 2. (T. 61).  The VE testified that there were also available jobs at the light exertional level, including interviewers, cashiers, and mail clerks. (T. 62).

---

[5] The medical professionals placed limitations on plaintiff's driving after she had her surgery. On April 7, 2015, her neurosurgeon stated that plaintiff was doing well, that she could do more physical exercise, "and can drive ***now***." (T. 306) (emphasis added).

[6] SVP stands for specific vocational preparation and is the amount of time required by a worker to learn the techniques, acquire the information, and develop the abilities needed for a particular job. https://www.onetcenter.org/questions/19.html.

The second hypothetical question added lifting restrictions, which would limit the hypothetical individual to lifting and/or carrying 10 pounds occasionally, and lesser amounts frequently. (*Id.*) The VE testified that these additional limitations would reduce the available cashier jobs by 80%, and would preclude performance of the mail clerk job. (T. 63). There would be no impact on the availability of interviewer jobs. (T. 63).

In response to a third question, the VE testified that if the hypothetical individual were to be off-task for 25% of the workday, "[t]hat would be work-preclusive." (T. 64). Four unscheduled absences per month would also preclude any competitive work. (*Id.*) The VE testified that the maximum tolerable percentage for being off-task is 10%, and an individual would only be allowed one unscheduled absence per month in order to maintain competitive employment. (*Id.*) The VE testified that the "off-task" and "absenteeism-related testimony" was based on his personal professional experience as well as on "human resource studies." (T. 65).

Plaintiff's counsel has summarized the relevant medical records in her brief. The Commissioner's counsel has adopted the recitation of the facts as stated by the ALJ in his opinion and the procedural history as set forth by plaintiff's counsel, except for any conclusions or inferences stated therein. (Pl.'s Br. at 2, Def.'s Br. at 2) (Dkt. Nos. 9, 16). Rather than reciting the medical evidence at the outset, the court will discuss the relevant details below, as necessary to address the issue raised by plaintiff and with any modifications noted in the decision.

## IV.  THE ALJ'S DECISION

After reviewing the procedural history of the plaintiff's application and stating the applicable law, the ALJ found that plaintiff had not engaged in substantial gainful

activity ("SGA") since her disability onset date.[7] (T. 21). At step two of the sequential evaluation, the ALJ found that plaintiff had the following severe impairments: obesity; basilar aneurysm residuals with headaches, right shoulder tendinitis, and adjustment disorder with depressed mood.[8] (T. 21-22). At step three of the evaluation, the ALJ found that plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of a Listed Impairment. (T. 22-23). In making this determination, the ALJ considered the effects of plaintiff's obesity as required by Social Security Ruling ("SSR") 02-1p. (T. 22). The ALJ also considered Listing 11.08 (traumatic brain injury); Listing 1.02 (arthritis); and Listing 12.04 (depressive, bipolar, and related disorders).

At step four, the ALJ found that plaintiff had the RFC for light work as defined in 20 C.F.R. § 404.1567(b), except that she could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, crawl, and climb ladders ropes, and scaffolds. (T. 23). Plaintiff could frequently reach with her right upper extremity. She was limited to performing simple, routine tasks and to making simple work-related decisions. She could not work with conveyor belts or assembly lines, and she must avoid bright, flashing lights. She required a work environment with no more than a moderate noise level and may not operate a motor vehicle for commercial purposes. (*Id.*)

The ALJ reviewed the medical evidence and plaintiff's stated symptoms. (T. 24-27). The ALJ gave little weight to the Medical Source Statements ("MSS") of

---

[7] Although plaintiff did perform some work activity after her disability onset date, the work did not rise to the level of SGA. (T. 21).

[8] The ALJ found that plaintiff had various additional, but non-severe impairments. (T. 21). Plaintiff does not challenge the ALJ's step two determination.

plaintiff's treating physicians, Dr. Suzanne Lamanna, D.O. and Claudine Ward, M.D. (T. 26). The ALJ found that Dr. Lamanna's MSS was a standard checklist form with no explanation and no rationale for any of the checked boxes. Dr. Ward's MSS was given little weight because the "marked and extreme ratings" were "inconsistent with outpatient medical records" and inconsistent with Dr, Noia, the psychiatric consultant's report, in which Dr. Noia found that plaintiff would have no limitation in any mental functions. (*Id.*) The ALJ gave Dr. Noia's report "great weight" because it was consistent with "normal mental status at that exam and during outpatient visits." (*Id.*)

The ALJ cited the report of a vocational rehabilitation counselor, as concluding that plaintiff could perform a "less stressful job." (T. 26). The ALJ also cited the counselor's report to the extent that the counselor tested plaintiff's intelligence and found normal cognitive functioning. (*Id.*) The ALJ also cited the counselor's report, to the extent that it found that plaintiff became fatigued during her academic testing. The counselor reported that plaintiff was unable to complete the reading section due to difficulty sustaining what she had read, and her mental fatigue prompted the counselor to skip over the spelling section. (*Id.*) The ALJ ultimately gave little weight to the counselor's report because it was not written by an acceptable medical source, and it contained no "clear delineation of functional limitations." (T. 26).

The ALJ gave "little weight" to the report of a state agency examiner, who like Dr. Noia, found no mental limitations. Instead, the ALJ incorporated "moderate" limitations in plaintiff's ability to concentrate, persist, and maintain pace, "deferring to the subjective complaints and performance on testing, in combination with post-aneurysm headaches and 'mental fatigue.'" (T. 27). The ALJ also gave "some" weight to the internal medicine consultative examiner, Dr. Kalyani Ganesh, who found no

limitations on sitting, standing, or walking, but restricted plaintiff to no heavy lifting, carrying, pushing, or pulling. (T. 27). The ALJ specifically stated that his RFC accounted for plaintiff's headache symptoms and their triggers. (*Id.*)

Based on the RFC discussed above, and the VE's testimony, the ALJ found that plaintiff could not perform her PRW. (*Id.*) However, based on plaintiff's age, education, work experience, and RFC, the ALJ found that there were a significant number of jobs in the national economy that plaintiff could perform. (T. 27-28). In making this decision, the ALJ used the Medical Vocational Guidelines ("the Grids") as a framework, and then determined that plaintiff would have additional limitations that would prevent her from performing the full range of work at any exertional level. (T. 28).

The ALJ found that if the plaintiff had the RFC to perform the full range of light work, the Grids would dictate a finding of "not disabled." (*Id.*) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 202.14). However, the ALJ found that the plaintiff's ability to perform substantially all the requirements of light work would be impeded by her additional limitations. To determine the extent that plaintiff's limitations would erode the occupational base of unskilled light jobs, the ALJ relied on the VE's testimony in response to the ALJ's hypothetical questions. The VE determined that, beginning with an RFC for light work, and considering all the additional limitations, plaintiff would be able to perform the jobs of interviewer, cashier, and mail clerk. (*Id.*) Based on the VE's testimony, the ALJ found that plaintiff was not disabled because she was capable of making a successful adjustment to other work which exists in significant numbers in the national economy.

## V.    ISSUES IN CONTENTION

Plaintiff raises the following arguments:

1.    The ALJ failed to properly weigh the opinions of plaintiff's treating physicians, Dr. Ward and Dr. Lamanna. (Pl.'s Br. at 11-17) (Dkt. No. 9).

2.    The ALJ erred in finding that plaintiff's testimony was inconsistent with the record evidence. (Pl.'s Br. at 17-21).

Defendant argues that the Commissioner's determination was supported by substantial evidence and should be affirmed. (Def.'s Br. at 6-14). For the following reasons, this court agrees with the plaintiff and will order remand to the Commissioner for further proceedings.

## DISCUSSION

## VI.    TREATING PHYSICIAN/RFC/SUBJECTIVE SYMPTOMS

### A.    Legal Standards

#### 1.    RFC

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis . . . ." A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's

subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R. §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Martone*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460 (W.D.N.Y. 1987)). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, No. 5:09-CV-1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7).

## 2. Weight of the Evidence/Treating Physician

In making a determination, the ALJ weighs all the evidence of record and carefully considers medical source opinions about any issue. SSR 96-5p, 1996 WL 374183, at *2-3 (1996). Under 20 C.F.R. §§ 404.1527(e) and 416.927(e), some issues are not "medical issues," but are "administrative findings." The responsibility for determining these issues belongs to the Commissioner. Social Security Ruling ("SSR") 96-5p, 1996 WL 374183, at *2. These issues include whether the plaintiff's impairments meet or equal a listed impairment; the plaintiff's RFC; how the vocational factors apply; and whether the plaintiff is "disabled" under the Act. *Id.*

In evaluating medical opinions on issues that are reserved to the Commissioner,

the ALJ must apply the factors listed in 20 C.F.R. §§ 404.1527(d) and 416.927(d). The ALJ must clearly state the legal rules that he applies and the weight that he accords the evidence considered. *Drysdale v. Colvin*, No. 14-CV-722, 2015 WL 3776382, at *2 (S.D.N.Y. June 16, 2015) (citing *Rivera v. Astrue*, No. 10 Civ. 4324, 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) (citation omitted)).

"Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, . . . the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record . . . ." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2004); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The ALJ must properly analyze the reasons that a report of a treating physician is rejected. *Halloran*, 362 F.3d at 32-33. An ALJ may not arbitrarily substitute his own judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

### 3.    Evaluation of Symptoms

In evaluating a plaintiff's RFC for work in the national economy, the ALJ must take the plaintiff's reports of pain and other symptoms into account. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). The ALJ must "'carefully consider'" all the evidence presented by claimants regarding their symptoms, which fall into seven relevant factors including 'daily activities' and the 'location, duration, frequency, and intensity of [their] pain or other symptoms.'" *Del Carmen Fernandez v. Berryhill*, No. 18-CV-326, 2019 WL 667743, at *9 (S.D.N.Y. Feb. 19, 2019) (citing 20 C.F.R. § 404.1529(c)(3);

Social Security Ruling (SSR) 16-3p, *Titles II and XVI: Evaluation of Symptoms in Disability Claims*, 81 FR 14166-01 at 14169-70, 2016 WL 1020935 (Mar. 16, 2016)).

In 2016 the Commissioner eliminated the use of term "credibility" from the "subregulatory policy" because the regulations themselves do not use that term. SSR 16-3p, 81 FR at 14167. Instead, symptom evaluation tracks the language of the regulations.[9] The evaluation of symptoms involves a two-step process. First, the ALJ must determine, based upon the objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ." 20 C.F.R. §§ 404.1529(a), (b); 416.929(a), (b).

If so, at the second step, the ALJ must consider "'the extent to which [the claimant's] alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the [objective medical evidence] and other evidence to decide how [the claimant's] symptoms affect [her] ability to work.'" *Barry v. Colvin*, 606 F. App'x 621, 623 (2d Cir. 2015) (citing inter alia 20 C.F.R. § 404.1529(a); *Genier v. Astrue*, 606 F.3d at 49) (alterations in original).[10] If the objective medical evidence does not substantiate the claimant's symptoms, the ALJ must consider the other evidence. *Cichocki v. Astrue*, 534 F. App'x 71, 76 (2d Cir. 2013) (citing superceded SSR 96-7p). The ALJ must assess the

---

[9] The standard for evaluating subjective symptoms has not changed in the regulations. Rather, the term "credibility" is no longer used, and SSR 16-3p makes it clear that the evaluation of the claimant's symptoms is not "an evaluation of the claimant's character." 81 FR at 14167. The court will remain consistent with the terms as used by the Commissioner.

[10] The court in *Barry* also cited SSR 96 7p, 1996 WL 374186, at *2 (July 2, 1996) which was superceded by SSR 16-3p. As stated above, the factors considered are the same under both rulings. The 2016 ruling has removed the emphasis on "credibility."

claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

The ALJ must provide specific reasons for the determination. *Cichocki v. Astrue*, 534 F. App'x at 76. However, the failure to specifically reference a particular relevant factor does not undermine the ALJ's assessment as long as there is substantial evidence supporting the determination. *Id. See also Del Carmen Fernandez v. Berryhill*, 2019 WL 667743 at *11 (citing *Rousey v. Comm'r of Soc. Sec.*, 285 F. Supp. 3d 723, 744 (S.D.N.Y. 2018)). "[R]emand is not required where 'the evidence of record allows the court to glean the rationale of an ALJ's decision.'" *Cichocki v. Astrue*, 534 F. App'x at 76 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)).

## B. Application

Plaintiff argues that the ALJ failed to properly weigh the reports of treating physicians Dr. Ward and Dr. Lamanna. In addition to her progress notes, Dr. Ward submitted a form,[11] dated October 31, 2016, which contains questions requiring narrative answers and questions requiring the doctor to check a box. (T. 590-92). Most

---

[11] The court notes that it appears that John Ligh, M.D. completed the form, and Dr. Ward reviewed, discussed, and signed it. (T. 590).

relevant to plaintiff's argument is the doctor's opinion that plaintiff's symptoms are "present to such an extent as to be distracting to adequate performance of daily activities or work causing the patient to be "off-task" for at least 25% of the time in an 8-hour workday." (T. 590). In addition, Dr. Ward indicated that plaintiff would have "good days" and "bad days," and that she would likely be absent "[m]ore than four days per month" as the result of her symptoms. (*Id.*)

The ALJ gave Dr. Ward's opinion "little" weight because the "marked and extreme ratings are inconsistent with outpatient medical records." (T. 26). The ALJ also stated that, despite the consistent "emotional disturbance," plaintiff's mental status checks were "negative for deficits in social functioning, memory, and concentration and attention." (*Id.*) The ALJ found that plaintiff's CT scans were negative following the aneurysm, and plaintiff's symptoms did not get worse when she stopped taking the Celexa. (*Id.*)

The ALJ also found that Dr. Ward's "opinion" was inconsistent with Dr. Noia's opinion that plaintiff would have no limitations in many of the tasks related to the ability to work, including no limitation in the ability to deal with stress and to relate and interact well with others. (T. 26) (citing Ex. 3F, T. 249). The ALJ gave Dr. Noia's report great weight because it was consistent with normal mental status "at that exam and during outpatient visits." (T. 26). The ALJ gave "little weight" to the state agency psychologist, who made essentially the findings as Dr. Noia, but who assessed a "non-severe"[12] adjustment disorder. (T. 26) (citing Ex. 2A, T. 72). The ALJ then stated that

---

[12] The court must point out that Dr. Noia stated that the results of the examination appear to be consistent with psychiatric problems, but in themselves, symptoms do not appear to be significant

17

"giving [the state agency psychologist] little weight, the undersigned incorporated moderate limits in concentrate [sic], persist [sic], and maintain pace [sic] deferring to subjective complaints and performance on testing, in combination with post-aneurysm headaches and "mental fatigue." (T. 27).

The ALJ's analysis is not supported by substantial evidence. A review of the portion of Dr. Ward's check-box form shows a serious error in the form itself. Additionally, the plaintiff's alleges that her headaches and fatigue prevent her from working on a consistent basis, and that plaintiff's headaches have frequently been the subject of Dr. Ward's and other narrative medical reports, which provide support for Dr. Wards "off-task" and "absentee" assessment.[13]

The court must first address the error in Dr. Ward's check-box form and in the ALJ's citation to the form. The check-box form signed by Dr. Ward and Dr. John Ligh,[14] M.D. omits an entire category of limitations. The limitations from which the doctors had to choose were "None/Mild," "Minimal," "Marked," and "Extreme." (T. 591). The section of the form which defines these limitations states that if an individual

---

enough to interfere with the claimant's ability to function on a daily basis." (T. 249). The definition of a "severe" impairment is one that significantly limits an individuals ability to perform basic work activities. 20 C.F.R. § 404.1520(c). Thus, it is unclear, but Dr. Noia may also have found that plaintiff's medically determinable psychiatric impairment was not severe.

[13] Defendant argues that Dr. Ward has only seen the plaintiff a limited number of times, which would take away from the weight afforded to her opinion. The defendant does not appear to question that Dr. Ward is a treating physician, only that the length of the relationship is not substantial. However, the court notes that plaintiff was referred to Dr. Ward specifically for her specialty in physical medicine and rehabilitation to assess the residuals of the aneurysm, thus, countering issue of the length of plaintiff's treatment by Dr. Ward and her co-workers.

[14] It is unclear whether this is actually the doctor's name. The signature appears to be "Ligh," but it is not totally legible.

had "Minimal" limitations, she would "retain the ability to sustain the activity consistently and without interruption due to symptoms throughout an 8 hour period of time despite the presence of limitations." (*Id.*) The next choice was "Marked" which was defined as "effectively precluded from performing the activity consistently and without interruption due to symptoms throughout an 8 hour period of time on a daily basis." The final category of limitation was "Extreme," which was defined as no ability to function.

The court notes that there was no category for "Moderate" limitations, and Dr. Ward found that the plaintiff would have no limitation in her ability to follow rules, only "Minimal Limitations" in her ability to function independently and ***maintain attention/concentration***. (T. 591) (emphasis added). She would also have "Minimal" limitations in the ability to understand, remember, and carry out simple as well as detailed, but not complex instructions. She would also have "Minimal Limitations" in maintaining personal appearance, relating predictably in social situations, and in demonstrating reliability. She would have "Marked" limitations relating to acquaintances and familiar people; in dealing with the public; in the use of judgment; in relating to authority figures; in dealing with stress; in understanding, remembering and carrying out complex instructions; and in behaving in an emotionally stable manner. (*Id.*)

The court first notes that although the ALJ mentioned "Extreme" limitations, there are no "Extreme" limitations checked on Dr. Ward's form. (T. 591). The court agrees that the "Marked" limitations are inconsistent with the treating physician's

progress notes and other evidence of record which consistently show that plaintiff is cooperative, her manner of relating and social skills were adequate, and her behavior was appropriate. (T. 247-48, 379). Patricia Faith, the Vocational Evaluator stated that plaintiff's vocational assets included being "[q]uite personable - easily engages others in conversation." (T. 553). On February 22, 2016, Dr. Ward noted that the plaintiff was volunteering in her grandson's classroom. (T. 361). These statements do not describe an individual who has "marked" limitations in the ability to relate to authority figures, relate to acquaintances and familiar people, deal with the public, and behave in an emotionally stable manner.

While the "Marked" limitations are inconsistent with the record evidence, the form itself created a dilemma for the doctor(s), and the court finds that the check-box portion of Dr. Ward's MSS is unreliable and may not adequately reflect the doctors' opinion of plaintiff's limitations. In addition, if the ALJ gave less weight to Dr. Ward's MSS, because the "Marked" and "Extreme" limitations were not consistent with her treating notes, there were no "Extreme" limitations checked, and the form did not give the doctor(s) the opportunity to check a limitation between Minimal and Extreme, it is possible that the doctor's report and the ALJ's decision would have been different if the form contained all the available limitations, and if the ALJ's facts were cited correctly.

In addition, the central problem in this case is not with plaintiff's cognitive abilities, her memory, or her ability to maintain attention and concentration generally because the ALJ is correct that plaintiff's records show that most medical professionals opine that plaintiff has few limitations in these areas. Plaintiff's problem appears to be

the ability to work consistently because of her headaches and fatigue. Although the ALJ states that he considered both of these limitations in the RFC, the court finds that his analysis is not supported by substantial evidence.

On June 2, 2015, plaintiff was examined by her neurosurgeon, Dr. Salish Krishnamurthy. (T. 305). At that time, plaintiff told the doctor that she was not having headaches, "except when she concentrates on reading or watching TV." (*Id.*) The plaintiff had gone back to smoking and drinking because she was "bored." (*Id.*) In July of 2015, Dr. Krishnamurthy did not mention headaches. (T. 304). However, on October 13, 2015, plaintiff was seen for a follow up visit by Dr. Krishnamurthy, who stated that plaintiff was "doing better but still gets headaches." (T. 303).

Plaintiff was referred to Dr. Ward by Dr. Lamanna in October of 2015 for evaluation of her headaches and other residuals of the aneurysm. (T. 391-93). Plaintiff has chronic daily headaches, which Dr. Ward states in her MSS, in addition to her adjustment disorder/emotional disturbance, would cause plaintiff to be off-task for 25% of the day and would cause her to be absent more than four days per month. (T. 590). There are three reports in the record written by Dr. Ward and/or residents who apparently work with Dr. Ward.[15] (T. 361-63 (2/22/16), 381-83 (11/25/15), 391-93 (10/19/15)). Dr. Ward is a physician in the Physical Medicine and Rehabilitation Department of Upstate Medical Center, who began seeing plaintiff on October 19, 2015, specifically for headaches. (T. 391).

---

[15] In two of her reports, Dr. Ward states that the "findings" were discussed with the resident, and that Dr. Ward "agree[ed] with the residents findings and plan as documented." (*See* T. 361, 391). The October 19, 2015 report was signed by Dr. Christina Zaccarini, M.D. (resident), and the February 22, 2016 report was signed by Grant Kamo, M.D. (resident). (T. 363).

On November 25, 2015, Dr. Ward stated that plaintiff restarted amitriptyline, which "improved her sleep quality and to a lesser extent her headaches." (T. 381). Dr. Ward stated that plaintiff's headaches "occur daily, but she feels that she is better at pacing herself and as a consequence can keep her headaches at a more tolerable level." (T. 381). Dr. Ward then described the plaintiff's different types of headaches, including occipital headaches that "occur more often," and her retro-orbital headaches, which were "squeezing and pulsating." (*Id.*) Dr. Ward stated that physical, cognitive, and visual stimulation triggered plaintiff's headaches, and she rated them from 3-5/10 in intensity "although they become debilitating twice a week," and were sometimes associated with nausea. (*Id.*) Dr. Ward also stated that plaintiff enjoyed volunteering in her grandson's classroom and "recognizes when she feels overstimulated and adjusts her exposure accordingly." (T. 381).

On February 22, 2016, plaintiff was seen by one of Dr. Ward's residents for "headaches." (T. 361). The doctor reported that plaintiff's eyestrain and headaches "improved with therapy," but that plaintiff had a constant warm, numbing sensation in the right parietal region that becomes more painful with activity." (*Id.*) Plaintiff reported a "daily pressure-like occipital headache that is less severe," but also reported a severe "moving" headache that had occurred less frequently "since her last visit [in November of 2015]." (*Id.*) On April 5, 2015, Dr. Suzanne Lamanna, D.O. submitted an MSS, stating that plaintiff had short term memory loss[16] with ADD, she had ringing in

---

[16] On July 13, 2015, Dr. Lamanna stated that plaintiff's short-term memory, judgment, and insight were intact. (T. 330).

her ears, along with "severe" headaches.[17] (T. 409). Dr. Lamanna stated that plaintiff needed to take a nap or she would become "very confused." (*Id.*) On July 13, 2015, Dr. Lamanna noted that plaintiff was following up for her depression, she had anxiety, and she was complaining of a headache, which felt like her whole head was being "squeezed in." (T. 328). Dr. Lamanna assessed several impairments, including "Headache: chronic, intermittent, uncontrolled." (T. 330).

Although the ALJ stated that he considered the plaintiff's headaches and fatigue, in his RFC,, it is unclear how her daily headaches, which are not questioned by her treating physicians, and her necessity for a nap during the day support her ability to perform work on a consistent basis. *See e.g, Kelsey O. v. Comm'r of Soc. Sec.*, No. 3:17-CV-525 (ATB), 2018 WL 3193197, at *5 (N.D.N.Y. June 28, 2018) ("The ALJ's reliance on isolated treatment notes showing that plaintiff was not experiencing headaches at the time of the examination fails to recognize the episodic nature of the impairment."); *Groff v. Comm'r of Soc. Sec.*, No. 7:05-CV-54 (NAM), 2008 WL 4104689, at *8 (N.D.N.Y. Sept. 3, 2008) ("[Migraine ] [s]ymptoms usually follow a pattern in each patient. . . . The patient may have attacks daily or only once every several months") (citing The Merck Manual 1376 (17th ed.1999)). The fact that plaintiff stated that she avoided activities which brought on the headaches and she could reduce them to a "tolerable" level does not indicate that she would be able to work consistently without experiencing debilitating headaches that would cause her to

---

[17] Dr. Lamanna also opined on plaintiff's physical abilities, which involved lifting only ten pounds occasionally and five pounds or less frequently. (T. 408). This would not be consistent with the physical ability to perform light work which requires the ability to lift 20 pounds occasionally and 10 pounds frequently.

be off-task or absent 25% of the time.  Volunteering at her son's school for one or two hours per day also does not indicate the ability for consistent work.

This case is distinguishable from *Smith v. Berryhill*, 740 F. App'x 721 (2d Cir. 2018), in which the Second Circuit found that the ALJ properly gave little weight to treating physicians' assessments of the plaintiff's inability to remain "on-task."  In *Smith*, the court found that the treating physicians' assessments were inconsistent with their treatment notes, the record evidence, and in one case, the doctor's opinion was not within her specialization. *Id.* at 723-26.

In this case, Vocational Evaluator Faith administered a variety of tests to plaintiff between April 18-20, 2016 and May 4, 2016. (T. 550-56).  Although the ALJ noted that Vocational Evaluator Faith was not an "acceptable medical source," and her report was given "little weight," in part, because it contained "no clear delineation of functional limitations," the ALJ apparently used the report when coming to the conclusion that plaintiff had "moderate" limitations in her abilities to concentrate, persist, and maintain pace.[18] (T. 27).

While the ALJ is correct that the Vocational Evaluator is not an "acceptable medical source" for purposes of establishing the existence of an impairment, such sources may be considered "'to show the severity of the individual's impairment(s) and how it affects the individual's ability to function.'" *Marnell v. Comm'r of Soc. Sec.*, No. 17-CV-6201, 2018 WL 3620152, at *11 (W.D.N.Y. July 30, 2018) (citing inter alia *Monette v. Colvin*, 654 F. App'x 516, 518 (2d Cir. 2018); 20 C.F.R. § 404.1513(d)(1);

---

[18] As stated above, the ALJ "deferred to subjective complaints and performance on testing" in addition to the post-aneurysm headaches and "mental fatigue." (T. 27).

416.913(d)(1));[19] *Sherry v. Berryhill*, No. 1:17-CV-1102, 2019 WL 441597, at *6 (W.D.N.Y. Feb. 5, 2019) (citations omitted). In addition, one of the evaluator's relevant findings was that plaintiff was too fatigued to continue the examination. This statement was not a medical diagnosis, but rather an observation that could be made by the evaluator without overstepping her expertise.

In discounting the evaluator's report, the ALJ also cited a section of the report, which noted that plaintiff's mental fatigue prompted the administrator to skip over the spelling section, . . . [h]owever, another entry details that she reads 'several chapters at a time.'" (T. 26). The ALJ has misread the "entry" that he cites as contradictory evidence to the Vocational Evaluator's finding of fatigue.

The ALJ's citation to "another entry" is to Dr. Ward's first examination of plaintiff, dated October 19, 2015. (T. 394). In this report, Dr. Ward states that plaintiff was referred by Dr. Lamanna "for brain injury symptoms including headache, visual disturbance, gait imbalance, photo -and phonophobia." (*Id.*) Dr. Ward then describes the plaintiff's "frequent headaches (daily) exacerbated by activity, coughing (has to hold head), any pressure on her midsection, having bowel movements, light, and sound."

The relevant sentence cited by the ALJ reads that "[v]ision is an issue, initially she had severe double vision. It is better now but still blurs. She only has blurry vision with tension and emotional distress. ***She has gradually been able to start reading (several chapters at a time). She does have confusion when reading.***" (*Id.*) The ALJ

---

[19] The regulations have been amended for claims filed on or after March 27, 2017. The former regulations apply to this plaintiff's case.

implied that Dr. Ward's comment was inconsistent with the Vocational Examiner's statement that plaintiff was fatigued during the testing, causing the examiner to skip over the spelling section of the test. However, Dr. Ward's statement regarding plaintiff's ability to read "several chapters at a time" was not an implication that plaintiff was reading quickly. It appears to be just the opposite. Dr. Ward was noting that plaintiff was only "gradually" able to read several chapters at a time, due in part to her blurry vision and her confusion. This statement is actually more consistent with the Vocational Evaluator's finding that plaintiff became fatigued during the examination. Thus, the ALJ's reasons for discounting Dr. Ward's RFC are not supported by substantial evidence of record, nor by the ALJ's own citations to the record.

Plaintiff also argues that the ALJ failed to give the proper weight to Dr. Lamanna's RFC evaluation, written on April 5, 2016. (T. 408-409). In that opinion, Dr. Lamanna opined that plaintiff would only be able to lift 10 pounds occasionally and 5 pounds frequently. (T. 408). Dr. Lamanna restricted plaintiff to three hours of sitting, standing, and walking in an 8-hour workday. (T. 408). The ALJ also gave the report little weight because it was a check-box form "with no explanation of limits and no rationale given for any checked boxes." (T. 26).

In *Halloran v. Barnhart*, 362 F.3d 28, 31 n.2 (2nd Cir. 2004), the Second Circuit noted the "limited value of the standardized check-box forms, which are considered only marginally useful for purposes of creating a reviewable factual record." *See Sabater v. Colvin*, No. 12-CV-4594, at *5 n.6 (S.D.N.Y. Mar. 10, 2016) (citing cases, including *Halloran*, supra). However, there are cases, holding that check-the-box

questionnaires are a proper format for a treating physician to express an opinion. *Goble v. Colvin*, No. 15-CV-6302, 2016 WL 3179901, at *5 (W.D.N.Y. June 8, 2016) (citations omitted). Check-the-box forms are widely used and are not invalid simply because of the nature of the form, as long as the findings are supported by the record.

The second page of Dr. Lamanna's check-box MSS describes plaintiff's symptoms in narrative form, stating that plaintiff had suffered short term memory loss with ADD, still had ringing in her ears, headaches, fatigue, and needed to take naps or she became confused. (T. 409). In this case, the record also contains narrative reports by Dr. Lamanna which do provide support for her findings regarding plaintiff's physical abilities. Dr. Lamanna began seeing plaintiff on June 10, 2015. (T. 353). Dr. Lamanna conducted a full examination of the plaintiff. Plaintiff reported fatigue and pain in addition to light sensitivity, various types of headaches, stiff neck, and weakness. (T. 353). Dr. Lamanna's examination also showed that plaintiff's motor strength was grossly intact in both her upper and lower extremities with good mobility. (T. 355).

The court would also point out that Dr. Lamanna's weight lifting restriction is consistent with the restriction imposed by Dr. Ward after a full examination of the plaintiff on October 19, 2015.[20] (T. 396). Dr. Ward stated that plaintiff was "restricted to lifting <10 lbs." (T. 396). As stated above, Dr. Ward did not question plaintiff's

---

[20] The court does note that, as stated above, the VE was asked about the 10 pound lifting restriction. (T. 62-63). The VE testified that such a restriction would reduce the cashier job by a full 80%, would preclude the mail clerk job, but would have no effect on the interviewer job. (T. 63). Thus, it is unclear whether the additional lifting restriction by itself would render the plaintiff disabled. However, on remand the Commissioner should reevaluate this restriction in combination with any other findings.

headaches, in fact, she prescribed the amitriptyline to reduce the headaches and muscle pain. (T. 398).

In Dr. Ward's February 22, 2016 report, plaintiff reported that her eyestrain and headaches had improved with therapy, and that overall, she was feeling better until she stepped into the building, and had a "right-sided burning headache and is feeling emotionally overwhelmed." (T. 361). Although plaintiff reported that she continued to volunteer in her grandson's classroom for 1-2 hours in the morning, she "adjusts her day to conserve energy." (*Id.*) Plaintiff also reported that "generally her daily nap improves her productivity and ability to concentrate for the remainder of the day." (*Id.*)

Although it is clear that plaintiff has good days, during which she denies headache, memory loss, and confusion, the episodic nature of plaintiff's headaches and other symptoms, together with her exhaustion during vocational testing is consistent with the episodic nature of her symptoms and the treating physicians' opinions. Thus, this court agrees that the ALJ improperly weighed the medical opinions, misread some of the evidence, and his conclusions are not supported by substantial evidence.

Finally, plaintiff argues that the ALJ did not properly evaluate plaintiff's subjective symptoms. This court agrees, in part, based on the discussion above. The ALJ stated that the plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that the plaintiff's statements concerning the intensity, persistence and limiting effects of those symptoms were not "entirely consistent with the medical evidence and other evidence . . . for the reasons explained in this decision." (T. 24). Because the ALJ erred in his analysis as stated above, his

analysis of plaintiff's subjective symptoms suffers from the same defect.[21]  For example, although the ALJ mentioned that plaintiff volunteered at her grandson's kindergarten, he did not mention that she had to "adjust her day" to conserve energy and she had to take a nap during the day so that she could concentrate.  The Vocational Examiner's report is also consistent with plaintiff's propensity toward fatigue, to the point where the examination had to be stopped each day before completion.

The court does note that plaintiff's more recent medical records may indicate improvement in her condition.  In addition to properly weighing the evidence, on remand the Commissioner may consider whether a closed period of disability is warranted in plaintiff's case.

## VII.  **NATURE OF REMAND**

### A.  **Legal Standards**

Remand to the Commissioner for further development of the evidence is appropriate when there are gaps in the administrative record or where the ALJ has applied an improper legal standard. *Rosa v. Callahan*, 168 F.3d 72, 82–83 (2d Cir. 1999).  Reversal for calculation of benefits is appropriate only if the record contains persuasive proof of disability and a remand for further evidentiary proceedings would serve no useful purpose. *Id.*

---

[21] Plaintiff argues that the ALJ did not consider the factors for analyzing subjective symptoms as set forth in SSR 16-3p cited above.  While it is true that the ALJ did not specifically number and consider the seven factors, he did discuss the "consistency" factor and the plaintiff's daily activities, including shopping, yoga practice, and volunteer work. (T. 24).  Plaintiff also argues that notwithstanding the ALJ's finding that plaintiff's allegations were not consistent with the medical evidence, he deferred to her claim that she had headaches and mental fatigue, but apparently not as severely as she claimed. (T. 27).

### B.    Application

Although this court finds that the ALJ's decision was not supported by substantial evidence because he failed to properly weigh the evidence and because he may have misread or misinterpreted evidence in the record, the court cannot say that the record contains persuasive proof of disability.  Thus, the proper remand is for further proceedings consistent with the above opinion, including a determination of whether a closed period of disability may be appropriate.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the Commissioner's decision is **REVERSED**, and this action is remanded pursuant to Sentence Four of 20 U.S.C. § 405 for further proceedings as discussed above, and it is

**ORDERED**, that judgment be entered for the **PLAINTIFF**.

Dated: March 26, 2019

**Hon. Andrew T. Baxter**
**U.S. Magistrate Judge**